J-A23032-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF: M.C.H. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.I.H. | No. 396 WDA 2014 |

Appeal from the Order entered February 12, 2014,
in the Court of Common Pleas of Washington County,
Orphans' Court, at No. 63-13-0616

| | |
|---|---|
| IN RE: ADOPTION OF: J.R.H. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.I.H. | No. 397 WDA 2014 |

Appeal from the Order dated February 12, 2014,
in the Court of Common Pleas of Washington County,
Orphans' Court, at No. 63-13-0617

BEFORE: DONOHUE, ALLEN and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:               **FILED OCTOBER 31, 2014**

R.I.H. ("Father") appeals from the Order involuntarily terminating his parental rights to his son, M.C.H. (d.o.b. 6/7/99), and daughter, J.R.H. (d.o.b. 7/28/01) (collectively referred to as "the Children") pursuant to a Petition for involuntary termination (hereinafter referred to as "the Termination Petition") filed by the Children's mother, K.C.M. ("Mother"), and her husband, M.C.M. ("Stepfather"). **See** 23 Pa.C.S.A. § 2511(a)(1) and (b). We affirm.

The trial court thoroughly set forth the relevant facts and procedural history underlying this appeal in its Pa.R.A.P. 1925(a) Opinion, which we incorporate herein by reference. **See** Trial Court Opinion, 4/17/14, at 1-8.[1]

Following the filing of the Termination Petition, the trial court appointed a Guardian *ad litem* ("GAL") to interview the Children, review the record, and submit to the court a recommendation as to whether termination of Father's parental rights would serve the Children's best interests. The GAL met separately with Mother, Stepfather, Father, and the Children. On January 27, 2014, the GAL issued her written Recommendation ("Recommendation"), wherein she stated that "several issues give [her] pause as to whether it would be in the best interests of the [] Children to terminate [Father's] parental rights," explaining, *inter alia*, as follows:

> First, although Mother testified that there is no bond between the Children and Father, it seems highly implausible that two Children who are quite old enough to have developed a loving bond with their Father[,] and appear to have done so, no longer have any bond because they have not seen him in over a year. … To this Counsel, [J.R.H.'s] desire to tell [] Father of the gift she had received despite having not seen him for several months[,] and [M.C.H.'s] desire to keep [] Father's [last] name[,] demonstrate that the Children do have a bond with Father. So, based on the evidence[,] is it in the Children's best interest to forever cut off all contact with their Father, thereby severing the bond that exists? Would not the psychological ramifications of termination be devastating and lasting, if the Children knew that their Father had been attempting to get back in their lives before this proceeding began?

_____

[1] Although the trial court's factual recitation continues onto page 9, we do not incorporate that portion herein.

… There is no doubt that Father has repeatedly demonstrated a dismal lack of effort to maintain a strong relationship with the Children. … Were Father's actions likely disappointing and perhaps angering to the Children? Most definitely. However, there was no testimony, and this Counsel did not gather from her conversations with the Children, that the Children have written Father off, so to speak, or that they harbor some deep-rooted resentment that makes continuing contact with Father contrary to their best interests. In fact, the Children seem to still maintain the natural desire to know and be loved by their biological father. They certainly may feel disappointed by Father[;] however, it seems that considering Father's apparent renewed will to fight for some contact with the Children, which interest began before the threat of losing them forever arose, there is a chance of an improvement in their relationship.

Third, there was no testimony that Father ever acted in a way to harm the Children or mistreat them. There was no testimony, nor was there mention in the private interviews, of anything other than a loving relationship between the Children and Father when they were together.

On the other hand, what is the benefit to termination? Mother and [Stepfather] testified that it would benefit the Children to have the stability and security of being adopted by [Stepfather] and making his position as a father-figure in their life official. Stability and cohesiveness of a family are absolutely important considerations. [Stepfather's] actions in stepping up as a father to these Children is admirable in two respects: one, in that he has filled in the gap of a very vital part in the [C]hildren's life, and two, he has provided the Children with a good example of a loving and supportive parent that they will hopefully emulate some day. … He has formed a lasting and loving bond with the Children, both of whom view him as a father-figure in their lives. But despite all of his flaws, Father[] is still [the Children's] biological father and they still appear to love him ….

Without a doubt[,] the Children are both flourishing in the care of [Mother and Stepfather], and undersigned Counsel does not believe that the Children should be anywhere else. What causes this Counsel hesitation and concern are the circumstances that seem to indicate a desire of the Children to maintain a bond with their Father, and Father's possible renewed desire for the same. It is therefore a recommendation of this Counsel that perhaps [the trial c]ourt would wish to have the opportunity to meet with

the Children in chambers to assist in determining whether termination would be in their best interest.

Recommendation, 1/27/14, at 6, 7-9 (unnumbered).

In response to the Recommendation, on January 28, 2014, the trial court conducted an *in camera* interview with the Children, wherein the court questioned them about their relationships and bonds with Father and Stepfather, their feelings regarding the proposed adoption, and how they would feel if they would never see Father again.[2]  Both of the Children discussed the parental duties that Stepfather performs for them, their bond with him, and stated that they call him "Dad" and view him as a father figure.  **See** N.T., 1/28/14, at 14-16, 29-32, 41-49.  Concerning the proposed adoption, J.R.H. testified "I want [Stepfather] to adopt me." **Id.** at 31.  She explained that she would like to be adopted "because [Stepfather is] more of a father to me because [Father] … hadn't really done anything to be with me." **Id.** at 32.  Upon being asked how she would feel if she would never see Father again, J.R.H. stated "I guess I'd be a little bit upset, but I'm not used to seeing him now because it's been a long time since I've seen him." **Id.**; **see also id.** (wherein J.R.H. explained her remark that she would be "a little bit upset" by stating "I guess every once in a while, I'd be

_____

[2] Prior to the *in camera* interview, Father's counsel gave the trial court a list of questions (hereinafter "Proposed Questions") for the court to ask the Children. **See** N.T., 1/28/14, Exhibit 1.  The trial court declined to ask the Proposed Questions that pertained to whether the Children wanted to have a relationship with their paternal extended family, and whether the Children were aware that Father was contesting the termination proceedings. **See id.**; **see also id.** at 7-9.

like maybe we should invite [Father,] but he probably won't come or something."). M.C.H. also testified that he wanted to be adopted by Stepfather. *Id.* at 48; *see also id.* (wherein M.C.H. stated that adoption would "be a good thing."). When the judge asked M.C.H. how he would feel if he never saw Father again, he replied, "I would just sort of feel normal because we don't really talk anymore anyway." *Id.* at 52. Finally, the GAL also testified at the *in camera* interview, essentially reiterating her opinion set forth in the Recommendation. *Id.* at 58-67.

Following the entry of the trial court's February 12, 2014 Order terminating Father's parental rights, Father timely filed a Notice of Appeal.

On appeal, Father presents the following issue for our review:

Contrary to the mandates of 23 Pa.C.S.A. § 2511(b), did the Trial Court abuse[] its discretion and commit [a] reversible error of law when it disregarded both the unrefuted, competent evidence that a loving and affectionate parent-child bond exists between [Father] and [the] Children, and the Re[commendation] and testimony of the [GAL] that termination of Father's parental rights is not in the best interests of the [] Children[?]

Father's Brief at 5.

Our standard of review is well-settled:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion

- 5 -

only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

*In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012) (citations omitted).

The burden is on the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained that the standard of clear and convincing evidence is defined as "testimony that is so clear, direct, weighty and convincing" as to enable the fact-finder to come to a clear conviction, "without hesitance, of the truth of the precise facts in issue." *Id.* (citation omitted).

In determining whether a trial court properly exercised its discretion in terminating parental rights, this Court must engage in a bifurcated analysis, first addressing whether the parent's conduct warrants termination of his or her parental rights, pursuant to 23 Pa.C.S.A. § 2511(a). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008-09 (Pa. Super. 2008) (*en banc*). "[O]nly if a court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *Id.* at 1009 (citation and quotation marks omitted). This Court may affirm a trial court's decision regarding the

termination of parental rights with regard to any one subsection of 2511(a).

**See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

In the instant case, the trial court determined that there was sufficient clear and convincing evidence presented to warrant termination of Father's parental rights under subsection 2511(a)(1).[3]  **See** Trial Court Opinion, 4/17/14, at 14 (stating that "[t]here is little question that Father has failed and refused to perform parental duties for [the C]hildren.  Father could not recite one instance within the year preceding the filing of the [Termination P]etition … in which he acted in a parental role to [the C]hildren."); **see also id.** at 14-15 (stating that "[o]ther than expressing his love for the [C]hildren, and relating his decision to hire an[] attorney to fight for his parental rights, Father could not testify to any affirmative act which he undertook to act as a parent to [the C]hildren."); **see id.** at 16 (finding that "Father offered no credible excuse for his failure and neglect as a parent.").[4]

On appeal, Father does not dispute the trial court's finding that the requirements of subsection 2511(a)(1) have been met.  Moreover, our review reveals that the record contains sufficient clear and convincing

---

[3] Subsection 2511(a)(1) provides grounds for termination of parental rights where "[t]he parent[,] by conduct continuing for a period of at least six months immediately preceding the filing of the [termination] petition[,] either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties."  23 Pa.C.S.A. § 2511(a)(1).

[4] The trial court fully set forth its rationale regarding subsection 2511(a)(1) in its Opinion.  **See** Trial Court Opinion, 4/17/14, at 14-19.  The trial court's rationale is supported by the record.

evidence to support the trial court's determination that termination of Father's parental rights under subsection 2511(a)(1) was warranted. **See** Trial Court Opinion, 4/17/14, at 14-19.

Having determined that the requirements of section 2511(a) are satisfied, we must determine whether the requirements of section 2511(b) are satisfied. **See In re Adoption of C.L.G., supra**. Section 2511(b) provides as follows:

> **(b) Other considerations.**-- The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b). This Court has stated that, whereas the focus in terminating parental rights under section 2511(a) is on the parent, under section 2511(b), it is on the children. **In re Adoption of C.L.G.**, 956 A.2d at 1008.

In reviewing the evidence in support of termination under section 2511(b), the Pennsylvania Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "intangibles such as love, comfort, security, and stability." [T]he

- 8 -

determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and brackets omitted). However, the mere existence of a bond attachment between the children and their parent will not necessarily result in the denial of a termination petition. *Id.* at 267. Additionally, a trial court must consider whether the children are in a pre-adoptive home and whether they have a bond with their putative adoptive parents. *Id.* at 268; *see also In re I.J.*, 972 A.2d 5, 13 (Pa. Super. 2009) (stating that "the strength of emotional bond between a child and a potential adoptive parent is an important consideration in a 'best interests' analysis."). Finally, it is well-settled that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *In re Z.P.*, 994 A.2d 1108, 1125 (Pa. Super. 2010).

Here, Father argues that the evidence was insufficient to establish, under section 2511(b), that termination of his parental rights was in the best interests of the Children. *See* Father's Brief at 14-23. Father points to the GAL's Recommendation and her testimony at the *in camera* interview that she had reasons to question whether termination of Father's parental rights served their best interests. *See id.* at 15-17 (citing Recommendation, 1/27/14, at 9 (wherein the GAL stated that the Children appear to love Father and have a bond with him)). According to Father, the trial court

erred by allegedly ignoring the GAL's opinion, and other evidence of record, that the Children and Father are bonded and have a loving relationship. **See** Father's Brief at 15. Father also alleges that the trial court erred in refusing to ask the Children all of the Proposed Questions that his counsel presented at the *in camera* interview. **See id.** at 17.

In its Opinion, the trial court discussed the best interests of the Children under section 2511(b), and stated its reasons for determining that there was sufficient clear and convincing evidence to establish that (1) termination of Father's parental rights, and adoption of the Children by Stepfather, served the Children's best interests; (2) the Children have a strong bond with Stepfather, who they view as a positive father figure; (3) the Children will not be adversely impacted by the termination of Father's parental rights; and (4) even if there is some minor bond between the Children and Father, this alone is not a sufficient reason to deny the Children the permanency of adoption. **See** Trial Court Opinion, 4/17/14, at 19-20.

Further, in his Pa.R.A.P. 1925(a) Opinion, the trial court judge who presided over the *in camera* interview and observed the Children's demeanor, found that "neither child expressed any hesitation, reservation or anxiety over this circumstance[,]" *i.e.*, adoption by Stepfather and never seeing Father again. **Id.** at 20. This Court has stated that

> unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an

> opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d at 826-27 (citations omitted). Accordingly, in the instant case, we must defer to the trial court's credibility determinations and its factual findings, which are supported by the record, even though the facts could arguably support an opposite result. **See** Trial Court Opinion, 4/17/14, at 19-20.

In its Opinion, the trial court also correctly rejected Father's claim that the court failed to adequately consider the GAL's Recommendation. **See id.** at 20-23. We agree with the trial court's rationale and incorporate it herein by reference. **See id.**; **see also In re Adoption of R.J.S.**, 889 A.2d 92, 100 n.8 (Pa. Super. 2005) (observing that a GAL's recommendation is purely advisory).

Moreover, the trial court points out that "since Father was offering to maintain only limited contact with the [C]hildren if his parental rights were not terminated, Mother was willing to agree to an open adoption under Act 101 ["Act 101"],[5] allowing some limited contact. Father, through his counsel, summarily rejected this offer." Trial Court Opinion, 4/17/14, at 13 (footnote added); **see also** Opinion and Order, 2/12/14, at 10 (same). The

---

[5] **See** 23 Pa.C.S.A. § 2731, *et seq*.

trial court further stated as follows regarding the proposal of an open adoption:

> [W]hile the [GAL], in her [Recommendation], placed significant emphasis on the fact that Father is only seeking limited visitation and contact, and that Father has no desire to displace the [C]hildren from their current home, Father did not express this limitation on the record, and there is no binding effect of any such expression. … [The offered open adoption a]greement could have resolved the issues of all concerned, providing permanency for the [C]hildren by maintaining Father's limited and infrequent contact in their lives. That Father would summarily reject this proposal makes suspect his claim that he is willing to accept a limited role in the [C]hildren's lives that would serve their best interests.

Trial Court Opinion, 4/17/14, at 13-14; *but see also id.* at 13 (stating that "the fact that Father was unwilling to consent to an 'open adoption' … was not, by any means, part of the [c]ourt's consideration in finding that Father had failed to perform his parental duties, or in its finding that termination would serve the best interests of the [C]hildren.").

Additionally, Father extensively relies upon the Supreme Court of Pennsylvania's decision in *In re Adoption of Charles E.D.M.*, 708 A.2d 88 (Pa. 1998), in support of his claim that the trial court failed to engage in a proper analysis regarding how terminating Father's relationship with the Children would affect their needs and welfare, and improperly overlooked the fact that Father does not seek to take the Children away from the home of Mother and Stepfather. *See* Father's Brief at 17-19, 21. In *E.D.M.*, the Supreme Court held that termination of the mother's parental rights was improper because the record lacked sufficient evidence to establish that

termination would be in the best interests of the children. ***E.D.M.***, 708 A.2d at 92-93. In so holding, the Court stated that

> [w]e cannot underestimate the importance of a child's relationship with his or her biological parent. Here, [the mother] does not seek to take the children from their home or family, but she is requesting visitation rights through which she may maintain a presence in the children's lives. This contact will allow the children to continue to feel loved by their mother and receive her guidance and nurturing. Further, it may preclude the children's painful search for their biological mother as a teen or an adult and the emotional injuries caused by the separation.

***Id.*** at 93.

In its Opinion, the trial court in this case determined that ***E.D.M.*** was unavailing to Father, stating as follows:

> The [trial c]ourt finds unpersuasive Father's reliance on [***E.D.M.***] In that case[,] the Supreme Court found that the record was devoid of evidence with respect to how the termination would affect either child's well-being, and how termination would serve the children's best interests. In the instant case, Mother and the [C]hildren have testified as to the lack of any meaningful relationship with Father. Both of [the C]hildren have expressed their desire to be adopted and to be formal members of Stepfather's family. Moreover, unlike the instant case, the mother in [] ***E.D.M.*** was faced with extraordinary antagonism from the father[,] who was seeking termination of her rights. That is not the case here. Although Father, on one hand, would claim that Mother would dictate the terms of his visitation with the [C]hildren and eventually force him to sever his contact completely, on the other hand[,] he would admit that he would continue to text and call his daughter, and that he would "but[t] heads" with Mother. The [trial c]ourt did not find credible Father's claim that Mother's contact impeded his ability to be a parent to his children. There was no testimony of any efforts that Father put forward to fulfill his parental role or to overcome any alleged barriers. The [trial c]ourt found nothing which would justify Father's lack of interest in [the C]hildren's daily lives, and in their health, safety, education and welfare.

Furthermore, [] **E.D.M.** was decided long before the enactment of Act 101, which would have allowed for post-termination contact by the mother in that case, and likely would have allayed the concern expressed by the Supreme Court that reversal of termination and maintaining the mother's limited presence in the children's lives "may preclude the children's painful search for their biological mother as a teen or an adult and the emotional injuries caused by the separation." [**E.D.M.**], 708 A.2d at [93]. The [C]hildren in [the instant] case displayed no fear of emotional injury at the prospect of being separated permanently from Father. On the contrary, the [C]hildren feel that they have been separated from Father already as a result of his gradual evaporation from their lives.

Trial Court Opinion, 4/17/14, at 17-18 (footnotes omitted). We agree with the trial court's analysis and its determination that **E.D.M.** is inapposite.

Finally, we find no merit to Father's argument that the trial court abused its discretion by refusing to ask the Children, at the *in camera* interview, all of the Proposed Questions submitted by Father's counsel. As noted above, the only Proposed Questions that the trial court refused to ask pertained to whether the Children wanted to have a continued relationship with their paternal extended family, and whether the Children were aware that Father was contesting the termination proceedings. **See** N.T., 1/28/14, Exhibit 1; **see also id.** at 7-9. The trial court did, in fact, ask the Children the *relevant* Proposed Questions, which pertained to the Children's bond with Father and how they would feel if they no longer were to see Father. **See id.** at 8-9, 31-31, 48, 52.

In summary, our review discloses that the trial court's analysis and factual findings in its Opinion are supported by the record, which contains sufficient competent evidence to sustain the trial court's determination that

termination of Father's parental rights would serve the Children's best interests by allowing them to be adopted by Stepfather, with whom they are undisputedly bonded. Accordingly, we affirm the trial court's Order terminating Father's parental rights to the Children.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/31/2014

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ADOPTION OF | ) | |
| | ) | |
| M.C.H. | ) | No. 63-2013-0616 |
| | ) | |
| And | ) | |
| | ) | |
| J.R.H., | ) | No. 63-2013-0617 |
| | ) | |
| Minor Children. | ) | |

## OPINION OF THE ORPHANS' COURT

This matter comes before the Superior Court on appeal from the order of the Orphans' Court dated February 12, 2014, granting the Petitions for Termination of Parental Rights filed on behalf of the Minor Children, J.R.H. and M.C.H., brought by the petitioners, M███ C. M███████ and K███ C. M███████, the children's step-father and mother, terminating the parental rights of the children's natural father, R███ I. H███ ("Father"). From this order, Father filed a timely appeal to the Superior Court, and the Trial Court shall treat this as a "fast track" appeal pursuant to Pa.R.A.P. 1925(a)(2)(ii).[1]

### Procedural History:

The Petitions for Termination of Parental Rights were filed on May 16, 2013, by the children's step-father, M███ C. M███████ ("Step-father") and K███ C██ M██████, the natural mother ("Mother"), seeking termination with respect to the natural father, R███ I. H███ ("Father").[2] The proceedings were scheduled for October 17, 2013, and all parties were

---

1 Pa.R.A.P. 1925(a)(2)(ii), effective March 16, 2009, regarding children's fast track appeals, requires this Court to "within 30 days file of record at least a brief opinion of the reasons for the order, or for the rulings or other errors complained of, which may, but need not, refer to the transcript of the proceedings."

2 On the same date that the Petitions for Termination were filed, Father filed a Complaint for Custody at No. 2013-

1

present with counsel. The Court then heard testimony and evidence from both sides. At no time during the proceedings did either parent request that a *Guardian ad Litem* be appointed for the children, even though it was apparent that Father was contesting the termination proceedings.

Thereafter, the Court made factual findings and entered an order terminating Father's parental rights by order dated November 1, 2013.

On November 21, 2013, Father presented a Motion for Reconsideration, asking the Court to reconsider its termination order in light of the decision in *Adoption of Charles E.D.M., II*, 505 Pa. 595, 708 A.2d 88 (1998). The Court agreed to review the matter and the case law and took the Motion under advisement. The Court executed an order to this effect on November 21, 2013, but the original was retained by Father's counsel and was not filed with the clerk of the Orphans' Court until December 9, 2013.

On December 2, 2013, Father filed an appeal to the Superior Court.

By order dated December 6, 2013, in consideration of Father's Motion for Reconsideration and in accordance with 20 Pa.C.S.A. § 2313(a), the Court, *sua sponte*, appointed Rachel Wheeler, Esquire as *Guardian ad Litem* for the children and ordered the *Guardian* to review the record, interview the children, conduct an investigation and issue a recommendation to the Court.

On December 23, 2013, upon consideration of an Application for Remand, the Superior Court vacated the Court's order of November 1, 2013 and remanded the case to the Court for completion of the record and entry of a new order.

---

2794 in the Washington County Court of Common Pleas Family division. By order dated May 31, 2013, Judge Gilman stayed all proceedings in the custody action pending resolution of the termination petitions, and on August 9, 2013, in response to Mother's emergency motion, Judge Gilman, with the consent of Father and his counsel, entered an order enjoining Father from any further communication with the children pending the resolution of the termination proceedings.

On December 28, 2013, the Court entered an order scheduling a reconsideration hearing for January 28, 2014.

The *Guardian ad Litem* filed her written report and recommendation on January 27, 2014.

On January 28, 2014, the parties appeared with counsel and the Court conducted an *in camera* interview with the children in the presence of counsel for both parents and the *Guardian ad Litem*.

On February 12, 2014, the Orphans' Court entered its Opinion and Order terminating the parental rights of Father to M.C.H. and J.R.H.

On March 5, Father filed his notice of appeal to the Superior Court.

### Factual Findings:

In consideration of the testimony and evidence presented, including the *in camera* testimony of the children, the Orphan's Court made the following factual findings:[3]

The children at issue are J.R.H., born on July 28, 2001, who is now twelve (12) years old, and M.C.H., born on December 31, 1999, who is now fourteen (14) years old. The children were born to Father and Mother during their marriage. The parties were married on June 7, 1997, and separated in January of 2005.[4] Since Mother and Father separated, the children have resided continuously with Mother, and Mother has been the sole physical custodial parent throughout. Pursuant to the parties' Marriage Settlement Agreement dated April 26, 2005, executed in resolution of their divorce filed in Allegheny County (Respondent's Exhibit D), Mother and Father had joint legal custody of the children, and Father had partial custody "as the parties shall

---

3 The Court made factual findings as set forth in its order of November 1, 2013, which were incorporated by reference in its Opinion and Order of February 12, 2014.
4 Trial Transcript of proceedings on October 17, 2013 ("TT"), page 112.

3

agree from time to time."5

After separation, the parties exercised an informal visitation schedule, and Father began visiting with the children with some regularity, including weekends and evenings during the week.6 Mother would make efforts to make the visitation schedule flexible, and would ask Father in advance for his work schedule, so that his work would not interfere with his time with the children.7 As time went on, Father's visits became less and less frequent. Mother would send Father the children's activity schedules and Father would not respond. Over time, Father would choose not to have a visit or would take the children for a brief time, taking them to the mall, to lunch, or for a walk, at times only for ten minutes to one hour.8 Father's visits gradually decreased in frequency, and in the time that Father actually spent with the children.9

Father had not been visiting the children regularly since 2009, when Mother and the children moved from the North Hills to Peters Township. Father has not had an overnight visit with the children in five to six years, and Father has not asked for an overnight visit during those years.10 Father ceased having overnights before Mother and the children moved to Peters Township.11 Father has not attended any school events or extra-curricular activities for the children in at least four years.12 Father did not contact the children during the last Christmas holiday nor send gifts, and Father did not acknowledge M.C.H.'s last two birthdays.13 Father eventually reduced his time with the children to only once per month, and these visits would usually last only for approximately an hour each, until Father ceased seeing the children

---

5 TT 86-88, 211.
6 TT 33.
7 TT 33-34.
8 TT 35; Transcript of Children's testimony dated January 28, 2014 ("CT"), pp. 19, 51.
9 TT 35; CT 51.
10 TT 42-43, 106.
11 TT 149.
12 TT 39-40.
13 TT 54.

4

altogether in August of 2012.14

Father's last visit with the children was August 12, 2012. During that visit Father took the children to his parents' home in Alison Park to go swimming. Father claimed that he had another visit with the children on October 28, 2012; however, the Court did not find Father's testimony to be credible in this regard. Father could not recall the visit in any detail.15 Moreover, the children did not recall this alleged visit with Father, although they could remember specific details of Halloween of that year.16

Father has not paid child support for the children since the parties separated in 2005, and has not supported his children in any other way,17 except that Father did contribute to the cost of a summer camp once in 2006.18 However, the parties, as an addendum to their marriage settlement agreement, agreed to designate the amount of $10,000 as the equity and contents of the marital home which Mother's received, and treated this as "pre-payment of child support" by Father.19

Father has not had any contact with the children in the six months preceding the petition for termination, except for an exchange of nine text messages with J.R.H. over a twelve minute time period on January 24, 2013 (Petitioner's Exhibit 3). This text exchange was initiated by J.R.H.20 J.R.H. explained that her reason for texting Father about her receiving a horse as a gift was because she wanted to tell everyone about her horse, including Father, and that Mother agreed that she should communicate to Father about her horse.21 J.R.H. further stated that she

---

14 TT 115-16.
15 TT 212.
16 CT 34, 51.
17 TT 52, 106.
18 TT 158-59, 195-98.
19 TT 52-53, 89-92; Respondent's Exhibit E.
20 TT 60-61, 79; CT 21-23.
21 CT 21, 27.

was disappointed that Father failed to follow through with his promise to visit her to see the horse.22 Father admitted that he had promised J.R.H. that he would come to watch her ride, but failed to follow through with his promise. Father also admitted that he made no effort to ask Mother about visiting J.R.H. at the stable to see the horse.23

There is no credible evidence that Mother interfered with Father's visitation or his parental duties. On the contrary, Mother encouraged and attempted to accommodate Father's visits and his work schedule, and to accommodate Father's holiday visits.24 Father has no credible explanation for his failure to perform parental duties. Father testified only that if Mother "says no, it's no,"25 but Father could not recall a specific instance of Mother interfering with his custody or visitation.

Mother offered into evidence her letter dated November 5, 2012 (Petitioner's Exhibit 1), in which Mother articulated concern over Father's recent DUI arrest. In the letter, Mother expressed fear of Father driving the children while intoxicated or "hung over" and stated "you cannot drive [the children] until you have completed a treatment program and become clean and sober." Although Father never responded to it, he testified that he interpreted this letter as a complete bar to all future visits,26 and that by this letter, Mother was barring him from all further contact with the children.27 The letter in question clearly was not intended to restrict Father from contact with his children, except driving, as set forth in its plain contents, and as testified to by Mother. Nevertheless, despite the clear language of the letter, Father interpreted it as a cessation of his contact with the children. "My interpretation was it's pretty obvious to me. It

---

22 CT 21-22, 24.
23 TT 212-13.
24 TT 78, 107-108, 111, 120.
25 TT 206.
26 TT 167.
27 TT 191-93.

6

says I'm not allowed to see the children and that's how I interpreted it."28

Mother's letter was demanding that Father complete alcohol treatment before he drove the children, however, in the letter she offered to have the paternal grandmother facilitate Father's visits. Father admitted that he did not respond to the letter or make any effort to address the issues Mother raised. Father conceded that he was accepted into the ARD program for the DUI, which required his completion of a court reporting network evaluation (CRN) and alcohol highway safety school, but admitted that he never attempted to allay Mother's concerns or to inform her that he had completed an alcohol program.29 Furthermore, although Father testified that he considered the November 5, 2012 letter a bar to any further contact with the children, he admitted that he continued to text the children and text and call Mother between November and December, 2012, and attempted to have a Thanksgiving visit that year.30

It was clear from the testimony that Father had failed to perform parental duties for the children for the six months preceding the termination petition and for years before. In addition to his failure to support the children financially, Father did not participate in any of the children's school activities or extra-curricular activities. The children corroborated that Father has not been involved in their school or extra-curricular activities, nor does he inquire of the children about school or grades.31 Although Father claimed that he was denied participation in school functions by Mother, he offered no supporting evidence of this claim. Per their marriage settlement agreement, the parties have joint legal custody, yet Father made no effort to monitor the children's education independently. Father admitted that he had only been on the School

---

28 TT 167.
29 TT 207-10, 245. At the hearing on October 17, Father admitted that he had not yet completed the requisite alcohol highway safety school.
30 TT 194-95.
31 CT 24.

District's website once or twice, even though his education and employment background is in information technology, and admitted that he made no effort to contact the School District directly.32 When asked why he did not contact the School directly in order to overcome the alleged barriers to prevent him from parenting his children, Father replied "I didn't know if I could get in trouble for doing that."33 Father could not offer any testimony as to how he has acted as a parent to his children in the one year preceding the filing of the termination petition, May 17, 2013. When asked specifically to identify an affirmative act he performed in a parental role for the children during the year preceding the petition, Father could only reply: "Hired an attorney so I could see them."34

Mother and Step-father married in August of 2009, and the children have lived with Mother and Step-father since then. The children have had a relationship with Step-father since the marriage and before. The children began referring to Step-father as "Dad" within a few months after Mother's marriage to him, without any prompting from Mother or Step-father, because it felt appropriate to the children.35 The children have bonded with their Step-father and he with them.36 The children have also bonded with Step-father's son D.M., who is age 15.37 Step-father has been performing the parental duties for the children that Father has failed and refused to perform.38 It was clear from the testimony, including that of the children, that Step-father provides love, comfort, security and stability for the children.

The children have little, if any bond with their Father due to his limited and sporadic participation in their lives, and the children do not ask about their Father when he is not

---

32 TT 210-11.
33 TT 211.
34 TT 216.
35 CT 28-29, 47-48.
36 TT 67; CT 28-29, 44.
37 CT 14, 41.
38 TT 65; CT 15-16, 28-30, 32, 42-44.

around.[39] Father is not and has not been a source of love, comfort, security or stability for the children. As a result of Father's failure to perform parental duties and his limited and sporadic participation in their lives, the children would not be adversely affected by the termination of Father's parental rights.

During their *in camera* interviews, the children expressed a desire to be adopted by their Step-father and to be made part of the M████████ family.[40] When asked if they understood that adoption meant that they would never visit or communicate with their Father again, both children acknowledged understanding of this and neither child expressed any hesitation, reservation or anxiety over this circumstance.[41] M.C.H. expressed the sentiment of the children most eloquently and effectively when he stated, in reference to his currently custody arrangements and the prospect of adoption by his Step-father, that "I guess we are already a family, but we would be like "**A Family**,'" adding significant emphasis to the words "A Family."[42]

## Legal Analysis:

In his Concise Statement of Matters Complained of on Appeal, Father raises eight allegations of error, all but two of which relate to the sufficiency of the Orphans' Court's factual findings that warranted the termination of his parental rights under the Adoption Code.

The standard and scope of review applicable in termination of parental rights cases requires the Superior Court to consider whether the decision of the trial court is supported by competent evidence:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient

---

[39] TT 67-69.
[40] CT 31, 48.
[41] CT 32, 52.
[42] CT 48. 69.

9

evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that it would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence. *In re: B.L.W.,* 843 A.2d 380, 383 (Pa.Super.2004).

The Supreme Court reiterated, in its decision in *In Re: Adoption of S.P.,* 616 Pa. 309, 47 A.3d 817 (2012), that the standard of review in termination of parental rights cases is whether the lower court committed an abuse of discretion:

> [W]e repeat that appellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.,* 608 Pa. 9, 9 A.3d 1179, 1190 (2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.; R.I.S.,* 36 A.3d at 572. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.; see also Samuel–Bassett v. Kia Motors America, Inc.,* —— Pa. ——, 34 A.3d 1, 51 (2011); *Christianson v. Ely,* 575 Pa. 647, 838 A.2d 630, 634 (2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*
>
> As we discussed in *R.J.T.,* there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.,* 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio,* 539 Pa. 161, 650 A.2d 1064, 1066 (1994).[43]

In his first claim of error, which is unrelated to the sufficiency of the evidence, Father claims that the "Court erred failing to expedite the termination proceedings, particularly in light

---

[43] In Re: Adoption of S.P., 616 Pa. at 325-26, 47 A.3d at 826-27.

of the fact that Mother caused Father's partial custody action to be stayed pending the outcome of the [termination proceedings]."[44] This claim is frivolous for three obvious reasons. First, although the termination petition was filed on May 16, 2013, at which time the trial was then scheduled for October 17, 2013, Father waited until August 28, 2013 to petition the Court for an "expedited hearing." By this time, there were no court dates available prior to October 17th, and the Court so advised Father and denied his petition. Father's counsel was well aware that during the entire year of 2013, the Court of Common Pleas of Washington County was missing one third of its bench, having lost two judges to retirement. There was simply no means to accommodate Father's request. Moreover, as noted in footnote two, above, Father and his counsel consented to the order of the custody court, dated August 9, 2013, just three weeks before he requested an expedited hearing, which enjoined Father from any further communication with the children pending the resolution of the termination proceedings.

Secondly, even though he was contesting the termination petition, Father failed to request that a *Guardian ad Litem* be appointed for the children, as required under Section 2313(a) of the Adoption Code.[45] As noted above, after the initial proceedings had concluded, Father filed a motion for reconsideration on other grounds. By order dated December 6, 2013, the Court, *sua sponte*, appointed Rachel Wheeler, Esquire as *Guardian ad Litem*, requiring the *Guardian* to review the record, interview the children, conduct an investigation and issue a recommendation to the Court. Thus, the proceedings would have had to be delayed in any case, so that a *guardian ad litem* could be appointed to comply with the Adoption Code.

Third, in order to sustain his claim of error regarding the Court's failure to expedite the proceedings, Father presumes that the facts presented for consideration by the Court would be

[44] Father's Concise Statement ¶ 1.
[45] 20 Pa.C.S.A. § 2313(a).

11

wholly different, that his failures and neglect as a parent would not be as obvious, and that he would have prevailed in these proceedings, allowing him to be reunited with his children. This is not the law. The Orphans' Court is required to review the parent's behavior in the six months preceding the petition. Termination of Father's parental rights was sought under sections 2511(a)(1)and (a)(2) of the Adoption Code, which provide as follows:

> (a)(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

> (a)(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well being, and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.[46]

As set forth herein, Father could not recite one occasion in which he acted in a parental role for his children in the year preceding the petition for termination. Any action undertaken by Father subsequent to the filing of the termination petition, including his attempt to expedite the proceedings, is of no moment.[47]

Father's second allegation unrelated to the sufficiency of the evidence is found in paragraph seven of his Concise Statement, in which he states:

> The Trial Court erred in basing its decision and opinion on Father's rejection of the Court's suggestion, in off the record discussions, that Father consider an "Act 101.37" Adoption when neither Party made a claim under that portion of the Act and there is no evidence in the record even suggesting such a claim.[48]

---

[46] 20 Pa.C.S.A. §§ 2511(a)(1) and 2511(a)(2).
[47] See *In Re: Z.S.W.*, 946 A.2d 726, 730 (2008), "the operative period for application of section 2511(a)(1) is the six-month period preceding the filing of the Petition.". . . Section 2511(b) specifically states that the trial court shall not consider those actions taken after the filing of the termination Petition where termination is appropriate under section 2511(a)(1). 23 Pa.C.S.A. § 2511(b).
[48] Father's concise statement at ¶ 7.

12

This claim is frivolous. In fact, there was a discussion, on the record as well as off the record, that since Father was offering to maintain only limited contact with the children if his parental rights were not terminated, Mother was willing to agree to an open adoption under Act 101, allowing some limited contact.[49] Father, through his counsel, summarily rejected this offer.[50] Furthermore, the fact that Father was unwilling to consent to an "open adoption" under Act 101 was not, by any means, part of the Court's consideration in finding that Father had failed to perform his parental duties, or in its finding that termination would serve the best interests of the children. On the contrary, this fact was referenced only to refute the claim of Father, through his counsel and the *Guardian ad Litem*, that if termination were denied, Father would maintain only a limited role in the children's lives and would not disrupt their current home life.

The lower Court noted that while the *Guardian*, in her report, placed significant emphasis on the fact that Father is only seeking limited visitation and contact, and that Father has no desire to displace the children from their current home, Father did not express this limitation on the record, and there is no binding effect of any such expression. If termination were denied, Father could immediately activate and amend his custody case, demanding full or shared custody, compelling the children and Mother to litigate the same. The lower Court found noteworthy that, when offered that Father could maintain contact with his children through an Act 101 agreement,[51] Father rejected this proposal. Such an agreement could have resolved the issues of all concerned, providing permanency for the children but maintaining Father's limited and infrequent contact in their lives. That Father would summarily reject this proposal makes suspect his claim that he is willing to accept a limited role in the children's lives that would serve

---

49 CT 67-68.
50 CT 68.
51 Chapter 27, Subchapter D of the Adoption Code, *Voluntary Agreement for Continuing Contact*, 23 Pa.C.S.A. § 2731 et seq.

13

their best interests. The Court's recitation of these facts had no bearing on its finding that Father had evidenced a settled purpose to relinquish his parental claim to the children by his failure to act as their parent in the year preceding the petition, and had no bearing on the finding that termination would serve the best interests of the children.

The remaining issues raised in Father's Concise Statement of Matters Complained of on Appeal all challenge the sufficiency of the record upon which the Orphans' Court based its findings.

There is little question that Father has failed and refused to perform parental duties for his children. Father could not recite one instance within the year preceding the filing of the petition, May 16, 2013, in which he acted in a parental role to his children. Father's last visit with the children was August 12, 2012, which consisted of taking the children swimming for the afternoon at his parents' home in Alison Park. Although Father claimed that he had another visit with the children on October 28, 2012, he could not remember any details of this visit.[52] Mother and the children denied that this more recent visit took place.[53] But for the brief text message exchange which J.R.H. initiated with Father on January 24, 2013, Father had no other contact with children in the six months preceding the petition, and did not recognize their birthdays or Christmas.

Father has not provided financial support of any kind for the children since 2006. Father has not been involved in the children's school or school activities or extra-curricular activities in years. In his limited and sporadic contact with the children, Father does not even ask the children about their grades or school. Other than expressing his love for the children, and relating his decision to hire an attorney to fight for his parental rights, Father could not testify to

[52] TT 212.
[53] CT 34, 51.

14

any affirmative act which he undertook to act as a parent for his children. There was no question that he had abandoned his parental responsibilities and duties.

The Supreme Court has defined parental duty as follows:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life.'

*In re C.M.S.*, 832 A.2d 457, 462 (Pa.Super.2003) (citing *In re Burns*, 474 Pa. 615, 379 A.2d 535 (1977)). *See In re: G.P.-R.*, 851 A.2d 967, 976, (2004) (internal citation omitted).

*In Re: B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004).

Father certainly has not "exerted himself" in any manner for his children, and has failed to make even minimal effort to maintain a place of importance in their lives. As noted above, when asked what he had done in the year preceding the petition to act as a parent to his children, Father's only response was: "Hired an attorney so I could see them."[54] The Supreme Court in *Adoption of Charles E.D.M., II*, stated that this is immaterial:

Therefore, the fact that in 1995, [mother] hired an attorney to request summer visits with the children and continued to make phone calls to the home in Erie is of no moment with regard to meeting the requirements of Section 2511(a)(1).

---

[54] TT 216.

15

550 Pa. 595, 602, 708 A.2d 88, 91 (1998).

The evidence then clearly established the Father's failure to perform parental duties and his settled purpose of relinquishing parental rights, upon which the Court then reviewed: 1) Father's explanation for his conduct; 2) the post-abandonment contact between Father and the children; and 3) consideration of the effect of termination of Father's parental rights on the children, pursuant to Section 2511(b).[55]

Father offered no credible excuse for his failure and neglect as a parent. Although he referred to Mother's letter of November 5, 2012, regarding his DUI arrest (Petitioner's Exhibit 1), Father accepted this letter as bar to future visits, which clearly, it was not intended to be. Father made no effort to respond or to explain to Mother that his DUI had been resolved with an ARD disposition and made no effort to allay her concerns about his drinking and driving. Father's claim that he did not have adequate funds to secure counsel for a custody battle in order to overcome Mother's alleged obstacles, was belied by his admission that he had sufficient funds to remodel a house which he owned with his sister, in which he had not been residing.[56]

> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. *In re Adoption of Dale A., II,* 453 Pa.Super. 106, 683 A.2d 297, 302 (1996) (internal citations omitted). A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. *In re C.M.S., supra* at 462 (citing *In re Shives,* 363 Pa.Super. 225, 525 A.2d 801 (1987)). Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs. *In re D.J.S., supra* at 287.

In Re: B., N.M., 856 A.2d 847, 855 (Pa.Super. 2004). The obstacles to his parenting efforts

---

[55] *In Re: Z.S.W.,* 946 A.2d 726, 730 (Pa.Super. 2008), quoting *Adoption of Charles E.D.M., II,* 550 Pa. 595, 708 A.2d 88, 91 (1998).
[56] TT 214-15.

16

which Father attempted to portray could hardly be called "difficult circumstances."
Nevertheless, Father did nothing to overcome any alleged obstacles, and acquiesced in Mother and Step-Father raising his children in his absence.

The Court found unpersuasive Father's reliance on *Adoption of Charles E.D.M., II,* 505 Pa. 595, 708 A.2d 88 (1998). In that case the Supreme Court found that the record was devoid of evidence with respect to how the termination would affect either child's well-being, and how termination would serve the children's best interests. In the instant case, Mother and the children have testified as to the lack of any meaningful relationship with Father. Both children have expressed their desire to be adopted and to be formal members of Step-father's family. Moreover, unlike the instant case, the mother in *Adoption of Charles E.D.M., II* was faced with extraordinary antagonism from the father who was seeking termination of her rights.[57] That is not the case here. Although Father, on one hand, would claim that Mother would dictate the terms of his visitation with the children and eventually force him to sever his contact completely, on the other hand he would admit that he would continue to text and call his daughter, and that he would "but heads" with Mother.[58] The Court did not find credible Father's claim that Mother's actions impeded his ability to be a parent to his children. There was no testimony of any efforts that Father put forward to fulfill his parental role or to overcome any alleged barriers. The Court found nothing which would justify Father's lack of interest in his children's daily lives, and in their health, safety, education and welfare.

---

[57] The Supreme Court did not review the adequacy of the lower court's consideration of the factors set forth in Section 2511(b), however the Court noted the lower court's findings regarding the antagonism between the parents which it did not find justified mother's conduct:

> While it is clear that [father] was extraordinarily antagonistic towards [mother], there is nothing in the record to indicate conduct that would justify or explain [mother's] almost complete manifestation of lack of interest. *Adoption of Charles E.D.M., II,* 550 Pa. at 602-603, 703 A.2d at 92.

[58] TT 209.

Furthermore, *Adoption of Charles E.D.M., II* was decided long before the enactment of Act 101,[59] which could have allowed for post-termination contact by the mother in that case, and likely would have allayed the concern expressed by the Supreme Court that reversal of termination and maintaining the mother's limited presence in the children's lives "may preclude the children's painful search for their biological mother as a teen or an adult and the emotional injuries caused by the separation." 550 Pa. at 605, 708 A.2d at 88. The children in this case displayed no fear of emotional injury at the prospect of being separated permanently from Father. On the contrary, the children feel that they have been separated from Father already as a result of his gradual evaporation from their lives.

Turning to the second prong of the requisite inquiry following its finding of failure to perform parental duties, the Court found no meaningful post-abandonment contact between Father and his children. As stated, Father had not been visiting the children regularly since 2009. Father has not had an overnight visit with the children in five to six years, and Father has not asked for an overnight visit during those years.[60] Father has not attended any school events or extra-curricular activities for the children in at least four years.[61] Father gradually reduced his time with the children to where he would only visit sporadically, in visits lasting only an hour each, until Father ceased seeing the children altogether in August of 2012.[62] Thereafter, Father had no contact with the children whatsoever, other than responding to a text message from his daughter, J.R.H. Father did not contact the children during the last Christmas holiday nor send

---

[59] Act 101 was enacted on October 27, 2010, effective in 180 days; *Adoption of Charles E.D.M., II* was decided March 27, 1998.
[60] TT 42-43, 106.
[61] TT 39-40.
[62] TT 115-16.

18

gifts, and Father did not acknowledge M.C.H.'s last two birthdays.63

Finally, with respect to the final prong of the requisite inquiry, the lower Court considered the effect of termination of Father's parental rights on the children, pursuant to Section 2511(b). The Court found that the children have little, if any bond with their Father due to his limited and sporadic participation in their lives.64 On the other hand, the children have bonded with their Step-father and he with them.65 The children began referring to Step-father as "Dad" within a few months after Mother's marriage to him, without any prompting from Mother or Step-father, because it felt appropriate to the children.66 Step-father has been performing the parental duties for the children that Father has failed and refused to perform.67 It was clear from the testimony, including that of the children, that it is Step-father who provides love, comfort, security and stability for the children, and not their biological Father.

Father is not and has not been a source of love, comfort, security or stability for the children.68 The children do not ask about their Father when he is not around.69 As a result of Father's failure to perform parental duties and his limited and infrequent participation in their lives, the children would not be adversely affected by the termination of Father's parental rights.

---

63 TT 54.

64 In paragraph 8 of his Concise Statement, Father claimed that the Court "erred in failing to properly consider uncontroverted evidence in the record that a loving and affection [sic] bond exists between Father and the Minor Children." Although Father and his sister, paternal aunt testified of a bond between Father and the children, this testimony was far from uncontroverted. The Mother testified that the children do not have a bond with their Father, and the children corroborated this in their testimony. The Court found this testimony more credible. Regardless, that the children may have some bond with their Father is not by itself, sufficient ground to deny the children the permanency of adoption. See *In Re: T.S.M., a Minor, T.R.M. a Minor, T.J.M., a Minor, T.A.M., a Minor, N.D.M., a Minor*, 71 A.3d 251 (Pa. Supreme Ct. 2013).

65 TT 67; CT 28-29, 44.

66 CT 28-29, 47-48.

67 TT 65; CT 15-16, 28-30, 32, 42-44.

68 In his Concise Statement, ¶ 5, Father claimed that the lower Court erred in by failing to find that the children's best interests would be served by having Father and his extended family continue in their lives. Other than their paternal aunt, Father's sister, there was no testimony that the children had any relationship with Father's extended family. Father's sister admitted that she had not seen the children since Father's last visit on August 12, 2012, and that she had not recognized the children's birthdays or sent gifts on holidays. TT 233-234.

69 TT 67-69.

During their *in camera* interviews, the children expressed a desire to be adopted by their Step-father and to be made part of the M███████family.[70] When asked if they understood that adoption meant that they would never visit or communicate with their Father again, both children acknowledged understanding of this and neither child expressed any hesitation, reservation or anxiety over this circumstance.[71] It was clear that the children long for the permanency of being formally a part of the Step-Father's home and family, as eloquently expressed by M.C.H. when he stated "I guess we are already a family, but we would be like "**A Family.**""

Based on the record, the lower Court found that Petitioners had met their burden to prove by clear and convincing evidence that Father has evidenced a settled purpose of relinquishing his parental claim to the children by his refusal, neglect and failure to perform parental duties, causing the children to be without essential parental care, control and subsistence necessary for their physical and emotional well-being, for the six months preceding the petition and for years before. In light of Father's admittedly infrequent and passive role in his children's lives, and his refusal to take responsibility for his lack of participation, there is no reasonable likelihood that Father will be able to remedy the conditions which contributed to his refusal, neglect and failure to perform parental duties. Accordingly, the lower Court found that Petitioners have met their burden to prove that Father's parental rights should be terminated.

Finally, the Court must respond to Father's claim that "the Trial Court erred in failing to properly consider the Report and testimony of the *Guardian ad Litem* that termination of Father's parental rights is not in the best interests of the Minor Children."[72] This allegation is a misrepresentation of the *Guardian's* written recommendation and her testimony. In her

---

70 CT 31, 48.
71 CT 32, 52.
72 Father's Concise Statement, ¶ 6.

20

recommendation dated January 27, 2014, the *Guardian* found Father's one year absence from the children's lives inexcusable, and stated that he "repeatedly demonstrated a dismal lack of effort to maintain a strong relationship with the children."[73] However, the Guardian was uncertain as to whether the termination of his rights would be in the best interests of the children. The *Guardian* recommended that Court "meet with the children in chambers to assist in determining whether termination would be in their best interest."[74] In her written recommendation and during her testimony, the *Guardian* did **not** unequivocally state that termination was adverse to the best interests of the children.[75]

In her recommendation, the *Guardian* struggled with making a recommendation whether termination would serve or not serve the best interests of the children, in large part on the basis that Father's parenting failures and passive neglect was not directly harmful to the children. The *Guardian* found noteworthy that "there was no testimony that Father ever acted in a way to harm the Children or mistreat them."[76] Likewise, Father argued that his rights should not be terminated because, unlike other termination cases which "typically involved having no relationship with the child at all since birth, a lack of relationship or contact for periods of years, parental drug, alcohol and other abuse, sometimes physical abuse endangering the children or the other parent, criminal conduct, and/or failure of the parent to have a relationship due to incarceration or outright abandonment,"[77] Father's conduct pales by comparison. The Court finds no merit in this position.

Section 2511(a)(1) of the Adoption Code has no requirement that the party seeking

---

73 Recommendation of *Guardian ad Litem*, dated January 27, 2014, p. 7.
74 Recommendation of *Guardian ad Litem*, pp. 6, 9, 10.
75 CT 64-66, 67. " . . . the question remains whether [the children] would benefit by the termination and whether that benefit would outweigh any future benefit they could have." CT 65.
76 Recommendation of *Guardian ad Litem* at page 8.
77 Father's Memorandum of Law in Opposition to Petitions for Involuntary Termination, page 2, footnote 1.

21

termination prove that the offending parent is abusive, drug dependent or otherwise detrimental to the children, only that only that the parent either demonstrates a settled purpose of relinquishing parental claim to a child *or* fails to perform parental duties. There is no question in this case that Father has failed to perform parental duties for his children. As set forth above, Father's attempts to attribute his parental failures to the obstacles Mother allegedly put before him were not credible, were not supported by the evidence, and certainly did not justify his lack of participation. The Court does not accept the rationale put forth by Father and the *Guardian ad Litem* that if Father does not present an immediate harm or detriment to the children, termination of his parental rights may not be appropriate. We must not lose sight of the fact that permanence, and the stability and security it entails, serves the best interests of the children. The children deserve the permanency that would result if termination and adoption were granted, and "adoption provides a sense of belonging to a stable family with emotional and physical security for a lifetime."[78] If the Court were to deny termination in hope that Father will now "step up" and begin acting as a parent to his children, the children would be denied this permanency, and the Court would be doing the children a disservice.

Indeed, the *Guardian ad Litem* acknowledges that "stability and cohesiveness of a family are absolutely important considerations." It is clear from the testimony of the children that they long for the stability and permanence that that have found with their Step-father, and want to formalize that familial relationship. As noted in the testimony of M.C.H., the children are in looking for the feeling of security as a "family" that Father has failed to provide.

---

[78] *Pennsylvania Dependency Benchbook*, Chapter 9.3 Adoption, p. 83, Office of Children and Families in the Courts, Administrative Office of Pennsylvania Courts. See also, *In Re: J.F.M.*, 71 A.3d 989, 997(Pa.Super. 2013)("This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future").

22

Based on the foregoing, the Orphans' Court found that the petitioners had met their burden to prove by clear and convincing evidence that termination of Father's parental rights would serve the needs and welfare of the children.

Accordingly,   based on the foregoing, the Orphans' Court respectfully submits that the order of court dated February 12, 2014, terminating Father's parental rights to the children, M.C.H. and J.R.H. should be affirmed.

Date:

4-16-14

By the Court,

_____ J.
John F. DiSalle, J.

23